```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


_____  )
                                     )
In re:                               )
                                     )
MARCIA L. CALLAHAN                   )
            Debtor                   )
                                     )
_____  )
                                     )
                                     )
UNITED STATES OF AMERICA             )
            Defendant-Appellant      )
                                     )
            v.                       )     CIVIL ACTION
                                     )     NO. 10-10924-WGY
MARCIA L. CALLAHAN                   )
            Plaintiff-Appellee       )
_____  )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                        December 8, 2010

**I.   INTRODUCTION**

The government appeals the March 18, 2010 Order of the United States Bankruptcy Court (the "Clarification"), Callahan v. United States (In re Callahan II), 425 B.R. 728 (Bankr. Mass 2010), which amended the Bankruptcy Court's opinion of November 2, 2009 (the "Decision"), Callahan v. United States (In re Callahan I), 419 B.R. 109 (Bankr. Mass. 2009), pursuant to an Order of Remand from this Court, United States v. Callahan (In re Callahan), No. 09-12129, 2010 WL 1170112 (D. Mass. Feb. 11, 2010).  In the Decision, the Bankruptcy Court ruled that certain federal tax liens assessed against James C. Callahan

1

("Callahan"), the non-debtor spouse of Marcia L. Callahan (the "Debtor"), and recorded against property in Falmouth, Massachusetts ("Falmouth Property"), were invalid because the government could not trace tax liens on encumbered funds to the Falmouth Property.

A.  **Procedural Posture**

The Bankruptcy Court entered the Decision against the government and in favor of the Debtor after a one-day bench trial.  The government timely filed notice of appeal in accordance with Federal Rules of Bankruptcy Procedure 8001(a) and 8002(a).  This Court heard the government's appeal and remanded the matter to the Bankruptcy Court for clarification.  Order, Feb. 10, 2010, No. 09-CV-12129, ECF No. 12.  This Court specifically requested that the Bankruptcy Court clarify whether it intended to make the factual finding that Callahan had made all the mortgage payments.  This Court noted that the government did not necessarily need to produce cancelled checks for each mortgage payment made by Callahan in order distinctly to trace encumbered funds to the Falmouth Property; testimony or other evidence would suffice.  After the Bankruptcy Court issued its Clarification,[1] the government again timely appealed in

---

[1] In the Clarification, the Bankruptcy Court stated that the use of the word "all" on the first line of page nine of the Decision was "an error and should instead have read 'contributions in an unproven number and amount towards.'"  In re Callahan II, 425 B.R. at 728.  The testimony indicated that the

accordance with Federal Rules of Bankruptcy Procedure 8001(a) and 8002(a).

**B.   Facts**[2]

The Debtor is the wife of taxpayer Callahan.  At the time of their marriage Callahan owned substantial assets; the Debtor in contrast entered the marriage with only a few thousand dollars.  Callahan testified[3] that it was always their intention that the Debtor would acquire assets "as soon as reasonably possible, meaning houses and real estate."

In 1989, the Debtor proposed to purchase the Falmouth Property as a second residence for her family.  At the time the Debtor already owned property at 269 Chapman Street in Canton, Massachusetts (the "Chapman Street Property"), which was used as the family's primary residence.  Callahan was consulted, but the

---

Debtor had contributed some undetermined amount towards the mortgage payments on the Falmouth Property between 1989 and 2001.  Id. at 729.

[2] The facts are taken from the Decision issued by the Bankruptcy Court.  In re Callahan I, 419 B.R. at 114-123.

[3] The Bankruptcy Court concluded that both the Debtor and Callahan testified credibly.  It stated:

> In particular, both the Debtor and Callahan were calm and forthright.  Any minor discrepancies in their testimony were attributable to simple memory lapses caused by the passage of time.  I further note that the United States provided no witnesses to contradict or rebut either the Debtor's or Callahan's testimony.

Id. at 114 n.2.

3

Debtor made the decision on her own to purchase the Falmouth Property.

On June 20, 1989, the Debtor settled the 121 Westwood Road Realty Trust to take title to the Falmouth Property and named herself trustee. Although the trust instrument references a schedule of beneficiaries executed on the same date, no such schedule was ever prepared or executed. On the same date, the Debtor took title to the Falmouth Property as trustee of the 121 Westwood Road Realty Trust.

The $50,000 down payment for the Falmouth Property came from the sale of stock of a company doing business as Strawberries Records. Neither Callahan nor the Debtor could recall in whose name the stock was owned or who contributed to the initial investment. The Debtor, as trustee of the 121 Westwood Road Realty Trust, granted a first mortgage on the Falmouth Property in favor of Bay State Federal Savings Bank. Both Callahan and the Debtor, individually and in her capacity as trustee, signed the note as borrowers. On the same date, the Debtor executed a note and second mortgage in favor of the Crowleys, the sellers of the Falmouth Property. Only the Debtor signed that note.

The Debtor earned no salary from 1990 through 2000. During this period, approximately 1989 to 2001, Callahan made mortgage payments on both the Chapman Street Property and Falmouth Property and paid various other bills. At trial, Callahan

4

explained that he was happy to pay the mortgages from "monies we had" for the benefit of the Debtor and their children.  The Debtor later testified that despite all these payments, there was never any understanding or agreement that Callahan would own any interest in either the Chapman Street Property or the Falmouth Property.

On November 2, 1994, the Debtor and Callahan filed a joint voluntary bankruptcy petition under Chapter 11.  The Schedule A filed in that case stated that they held "a one hundred percent beneficial interest in the 121 Westwood Road Realty Trust."

On August 30, 2001, the Debtor, as trustee of the 121 Westwood Road Realty Trust, deeded the Falmouth Property to herself individually for the stated consideration of one dollar for the purpose of refinancing the mortgage that property.  The Debtor used funds from the refinancing to pay off the mortgage on her Chapman Street Property, and for school tuition for her children, mortgage payments, and property maintenance costs.

On June 28, 2002, Andrew Callahan, the Debtor's son, settled the A.J. Financial Trust naming himself as the trustee.  Less than two months later, by deed dated August 8, 2002, the Debtor transferred the Falmouth Property to Andrew Callahan, as trustee of the A.J. Financial Trust.

On April 1, 2004, Andrew Callahan, as trustee of the A.J. Financial Trust, reconveyed the Falmouth Property to the Debtor

5

for the stated consideration of one dollar.  She then again refinanced the mortgage on the Falmouth Property.  The Debtor loaned funds received from refinancing to the Blue Hill, a new restaurant primarily run by Callahan.  She explained that she "believed in the business and hoped that it would one day provide employment for all four members of her family."  A mere fifteen days later, the Debtor conveyed the Falmouth Property to the A.J. Financial Trust.

Based upon Callahan's unpaid tax obligations from 1991 to 2001, federal tax liens were recorded on October 7, 2005 against "A.J. Financial Trust, and/or, Nominee of Transferee of James C. Callahan" and "Marcia Callahan Nominee and/or, Nominee of Transferee James C. Callahan" on both the Chapman Street Property and the Falmouth Property.

The Debtor filed a voluntary bankruptcy petition under Chapter 11 on October 5, 2006.  On March 21, 2007, she filed the present adversary proceeding seeking a determination that those tax liens were invalid.

## II. ANALYSIS

On appeal from a judgment in an adversary proceeding, this Court reviews the Bankruptcy Court's "factual findings for plain error . . . and conclusions of law de novo."  <u>In re Indus. Commer. Elec., Inc.</u>, 319 B.R. 35, 46 (D. Mass. 2005).  The Supreme Court explained the plain error or clearly erroneous

standard:

> "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.". . . . If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

Anderson v. City of Bessamer City, 470 U.S. 564, 573-74 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

**A. Nominee Theory**

A nominee is one who holds bare legal title to property for the benefit of another. Black's Law Dictionary 1076 (8th ed. 2004). The government may collect a taxpayer's unpaid tax liabilities out of property held by a nominee of the taxpayer. See G.M. Leasing Corp. v. United States, 429 U.S. 338, 350-51 (1977); Shades Ridge Holding Co. v. United States, 888 F.2d 725, 728-29 (11th Cir. 1989).

The government alleges that the Bankruptcy Court erred in concluding that the Debtor, the 121 Westwood Road Realty Trust, and the A.J. Financial Trust did not hold the title to the Falmouth Property as Callahan's nominees. Specifically, it claims the court incorrectly applied the nominee standard as a two-step process looking first to state and then to federal law. The government argues that instead of this two-step test, federal

7

nominee law alone should have been determinative.

The Bankruptcy Court expressed concern that the government had the cart before the horse and rejected the government's argument that United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979), mandates the application of federal standard to tax collection cases. See In re Callahan I, 419 B.R. at 125 & n.140. Instead, the Bankruptcy Court insisted on the two-step approach to nominee analysis. First, as a threshold matter, the court had to determine whether, under Massachusetts law, Callahan held an existing interest or right in the Falmouth Property, and only then would the court apply the factors developed by federal law to determine whether this interest could be reached for purposes of tax liability. Id. at 126.

At the first step, the Bankruptcy Court relied on two Supreme Court cases and explained that when looking to state law, courts must "consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them."[4] In re Callahan I, 419 B.R. at 125 (quoting United States v. Craft, 535 U.S. 274, 279 (2002)

---

[4] Drye further explained the relationship between state and federal law and their role in the analysis of tax lien controversies and reaffirmed the two-step approach: "[W]e look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights of property' within the compass of the federal tax lien legislation." 528 U.S. at 58.

(emphasis added)); see also id. (citing Drye v. United States, 528 U.S. 49, 59-61 (1999)).  The court concluded that Callahan held no interest in the Falmouth Property under Massachusetts law, so the tax lien could not reach that property.

The Bankruptcy Court proceeded to the second step of the analysis even though its decision at the first step was fatal to the government's claim.  After correctly listing the factors relevant to the nominee inquiry under federal law,[5] the court considered the government's assertions that Callahan had nominal control over the Falmouth Property.  It found them unpersuasive, however, due to evidence adduced at trial that showed that the Debtor had been the one who had repeatedly leveraged the Falmouth Property and had been in control of it at all times. Accordingly, the Bankruptcy Court concluded that, even applying the federal factors, the government's attempt to reach the Falmouth Property through a nominee theory failed.

---

[5] In federal tax lien cases, courts usually consider the following factors: the lack of consideration paid by the titleholder; a close relationship between the taxpayer and the titleholder; the control exercised over the property by the taxpayer while title is held by another; the use and enjoyment by the taxpayer of the property titled to another; lack of interference in taxpayer's use of property by the titleholder; the use of property or funds titled to another to pay the taxpayer's personal expenses; whether the taxpayer exercises dominion and control over the property, or treats it as if it belongs to him; whether title was placed in the record owner's name as a result of or in anticipation of the taxpayer's liability.  See, e.g., Oxford Capital Corp. v. United States, 211 F.3d 280, 284 n.1 (5th Cir. 2000).

The government's argument that this analysis of the nominee issue was erroneous is not persuasive. Generally, courts employ one of two approaches to the nominee theory with respect to taxpayer liability; both approaches employ the well-known principle that federal tax law cannot create a property interest that otherwise does not exist under state law. See Craft, 535 U.S. at 278-79; Drye, 528 U.S. at 58. Some courts expressly recognize that whether a titleholder is a nominee of a taxpayer ought be determined under state law. See, e.g., United States v. Stinson, 386 F. Supp. 2d 1207, 1218 (W.D. Okla. 2005); Cody v. United States, 348 F. Supp. 2d 682, 694 (E.D. Va. 2004); United States v. Snyder, 233 F. Supp. 2d 293, 296 (D. Conn. 2002). Other courts, while not expressly acknowledging that state law is applicable, include an additional step in the nominee determination which requires first an examination of state law to determine whether the taxpayer held some interest in the property. See, e.g., Holman v. United States, 505 F.3d 1060, 1067-68 (10th Cir. 2007); Spotts v. United States, 429 F.3d 248, 251 (6th Cir. 2005). Under either approach, property titled to the purported nominee cannot be reached for tax liability purposes unless the taxpayer has some property interest cognizable under state law.

In the case at bar, the Bankruptcy Court followed the two-step approach. The court determined that Callahan held no

interest in the Falmouth Property under Massachusetts law and that even when considering the factors argued by the government, the evidence contradicted any finding of nominal control by Callahan. There is nothing in the record to indicate that this factual finding was plain error.

Since applying both approaches to the nominee inquiry led to the same conclusion, whether the Bankruptcy Court erred in choosing the two-step approach is hardly a question before this Court. Additionally, since there is no Massachusetts precedent or law on the application of the nominee theory that could guide the Bankruptcy Court in its analysis, and none was cited by either party, the Bankruptcy Court did not err in looking to other courts for guidance. Therefore, the Bankruptcy Court did not err in its application of nominee theory in this case.

**B. Lien Tracing Theory**

The government argues that the Bankruptcy Court, in the Decision, mistakenly concluded that the government failed to carry its burden distinctly to trace funds from Callahan to the Falmouth Property. It also argues that Callahan's testimony and corroborating evidence demonstrate that all mortgage payments between 1989 and 2001 came from Callahan.

Once a tax lien attaches to property, "[t]he lien reattaches to the thing and to whatever is substituted for it. . . . The owner and the lien holder, whose claims have been wrongfully

displaced, may follow the proceeds wherever they can *distinctly trace* them." Phelps v. United States, 421 U.S. 330, 334-335 (1975) (quoting Sheppard v. Taylor, 30 U.S. (5 Pet.) 675, 710 (1831)) (emphasis added).

It is undisputed that a tax lien attached to all of Callahan's property on January 1, 1996. It is also undisputed that Callahan made at least some mortgage payments on both the Chapman Street Property and the Falmouth Property. In re Callahan II, 425 B.R. at 728-29. The government argues that all the mortgage payments from January 1, 1996 to August 30, 2001 were made by Callahan. After considering the evidence provided, the Bankruptcy Court made a finding of fact that the government failed distinctly to trace encumbered funds from Callahan to the Falmouth Property. It stated:

> Not only did the Debtor dispute that premise by stating that she made mortgage payments from funds taken from the equity of the Falmouth Property and the Chapman Street Property, the United States was given [the] opportunity on June 20, 2009 and failed to show that Callahan made a single payment with encumbered funds.

In re Callahan I, 419 B.R. at 132-33. Moreover, the Bankruptcy Court noted that the government essentially conceded its failure of proof on this issue in its post-trial brief. Id. at 132.

After reviewing the record plus the supplemental briefs filed by the parties on March 11, 2010, the Bankruptcy Court concluded that Callahan's testimony indicated that the Debtor contributed some undetermined amount towards the mortgage

12

payments between 1989 and 2001.  In re Callahan II, 425 B.R. at 730.  It also stated that the government "painted an incomplete portrait of the Debtor's and Callahan's financial history at trial."  Id. at 731.  In other words, there was no evidence about Callahan's or the Debtor's income or assets or about how they spent their income.  The Bankruptcy Court noted that the government's burden distinctly to trace required "specificity and quantification" of Callahan's contribution, not "inferences and assumptions" that went against the parties' testimony.  Id. at 731.

The government disagrees with the Bankruptcy Court's analysis of Callahan's testimony.  The government's argument, however, is not persuasive.  Callahan stated in his testimony that during that period he had made all the mortgage payments on the Chapman Street Property, id. at 730, but he never clearly testified similarly about the Falmouth Property.  Id.  Moreover, the Bankruptcy Court found that some mortgage payments came from the money received by the Debtor from refinancing her properties. In re Callahan I, 419 B.R. at 121.

The government also argues that it was reversible error for the Bankruptcy Court to impose on it the burden of proving that not a single mortgage payment came from the Debtor.  The Bankruptcy Court explained that "[i]t is the burden of the United States as the party seeking to apply [section 6321 of the

13

Internal Revenue Code] to prove a person or entity is in fact the nominee or alter ego of the taxpayer." In re Callahan I at 124. Because only the Debtor knows who made the mortgage payments, the government argues, she should have borne the burden on that issue.

This argument is flawed on both legal and factual grounds. The government relies on various cases stating that the taxpayer has the burden of proof in matters where she possesses the relevant evidence. See, e.g., United States v. Rexach, 482 F.2d 10, 17 (1st Cir. 1973) (holding that in a tax collection suit or government counterclaim to a taxpayer refund suit, the taxpayer bears the burdens of production and persuasion). None of the cases cited by the government are particularly persuasive, however, since they are all tax deficiency or refund cases, which implicate the presumption that the government determined the correct amount of tax owed such that the taxpayer bore the burden of proving otherwise.

Courts have disagreed over whether the government should bear the burden of proof when proving a tax claim in bankruptcy. This Court in Thinking Machines Corp. v. New Mexico Taxation and Revenue Dep't, 211 B.R. 426 (D. Mass. 1997) summarized the state of the law:

> The Bankruptcy Code and the Federal Bankruptcy Rules of Procedure are silent, however, with respect to the proper allocation of the ultimate burden of proof when a tax claim is asserted in bankruptcy, and indeed with respect

14

>to the ultimate burden of proof for <u>any</u> claim asserted
>against the debtor. Although courts <u>generally</u> assume
>that this ultimate burden rests with the claimant, the
>federal circuit courts of appeals are split on the
>question of whether the ultimate burden falls upon the
>taxpayer or the taxing authority when a tax claim is
>asserted in the context of a bankruptcy proceeding. The
>Third, Fourth, and Seventh Circuits have held that the
>taxpayer-debtor bears the ultimate burden of proof, just
>as it does outside of bankruptcy, while the Fifth,
>Eighth, Ninth, and Tenth Circuits place the ultimate
>burden on the taxing authority. The First Circuit has
>yet to address this issue.

<u>Id.</u> at 429-30 (citations omitted). Another court has explained that usually "cases which have invoked [the general rule allocating the burden of proof to the moving party] even when the claimant is a taxing authority have done so on the basis that (1) the Code lacks any provision which distinguishes government claims from claims of private entities, and (2) the IRS should be 'treated like any other claimant under the Bankruptcy Code because the estate is a party in interest and not just a taxpayer.'" <u>In re Premo</u>, 116 B.R. 515, 523 (Bankr. E.D. Mich. 1990) (citations omitted) (quoting <u>In re Brady</u>, 110 B.R. 16, 18 (Bankr. D. Nev. 1990)).

Here, it is important to note that, although there is an underlying tax claim against Callahan, the issue is the validity of the tax lien against the Falmouth Property. The government has the burden of proving its right to a lien; had the government shown the existence of a valid tax lien, the Debtor would have had the burden of proof to discharge it. The government,

15

however, failed to show that Callahan made a single payment to the Falmouth Property with encumbered funds, while the Debtor testified that she had made the mortgage payments. The Bankruptcy Court made a finding of fact that the government failed distinctly to trace encumbered funds from Callahan to the Falmouth Property; based on this evidentiary record, that finding was not plain error, so the judgment of the Bankruptcy Court must be affirmed.

## C. 121 Westwood Road Realty Trust

The Bankruptcy Court held that the 121 Westwood Road Realty Trust failed for failure to execute a schedule of beneficiaries and that, as a result, the Falmouth Property was held by the Debtor individually. In re Callahan I, 419 B.R. at 127 (citing Arlington Trust Co. v. Caimi, 414 Mass. 839, 848 (1993)). The Bankruptcy Court made a factual finding that the Debtor had failed to prepare a schedule of beneficiaries. Since the Debtor failed to do what the declaration of trust required, the Bankruptcy Court concluded that the 121 Westwood Road Realty Trust failed and that the Debtor took title to the Falmouth Property in her individual capacity.

### 1. Failure of the 121 Westwood Road Realty Trust

The government argues that the 121 Westwood Road Realty Trust did not fail. It does not dispute the law laid out by the Bankruptcy Court, but argues that the court mistakenly found that

the schedule of beneficiaries was not created.  Specifically, it
claims that Schedule A filed by the Debtor and Callahan in their
1994 joint Chapter 11 bankruptcy petition six years after the
trust was created qualifies as the schedule of beneficiaries.

The Bankruptcy Court acknowledged the existence of the
Schedule A described by the government.  In re Callahan, 419 B.R.
at 118.  It noted, however, that very little information was
offered at trial about the 1994 bankruptcy and that the Schedule
A was never introduced as an exhibit.  Id.  Though not explicit
in the Decision, the Bankruptcy Court necessarily concluded that
the Schedule A did not represent the missing schedule of
beneficiaries referenced in the trust documents.  See id. at 127
(holding that the 121 Westwood Road Realty Trust failed due to
the lack of a schedule of beneficiaries).  This finding was not
plain error.  The trust instrument references a schedule of
beneficiaries executed on the same date; and the Schedule A in
question was prepared six years later.  The decision of the
Bankruptcy Court on this matter must be affirmed.

### 2. Resulting Trust

Alternatively, the government argues that even if the 121
Westwood Road Realty Trust failed, the property right did not
vest in the Debtor, but rather a resulting trust in favor of
Callahan was created.

A resulting trust is generally presumed when "one party pays

17

the purchase price of property, but title is placed in the name of another . . . ." Feinman v. Lombardo, 214 B.R. 260, 267 (D. Mass. 1997) (Collings, M.J.). "In contrast when, the transfer is between spouses the presumption is that the payor intended the title holder to take the property by way of a gift, rather than holding it in a resulting trust." Id. Either presumption may be rebutted by a showing of clear evidence of contrary intent. Ross v. Ross, 2 Mass. App. Ct. 502, 508 (1974).

The Bankruptcy Court held that a resulting trust in favor of Callahan was not created because the government failed to prove that Callahan provided either the entire purchase price for the Falmouth Property or that he paid a specific and definite amount towards the purchase price, or alternatively because the government failed to present evidence rebutting the marital presumption.

The government disputes both rulings simply restating arguments made at trial: that the Debtor earned no money and so the natural assumption is that the purchase price and all other mortgage payments were made by Callahan, and that the marital presumption does not apply because property was deeded to the trust, not to the Debtor individually. None of these arguments persuade this Court that the Bankruptcy Court committed plain error, so the judgment is affirmed.

**D.  CONCLUSION**

For the above mentioned reasons this Court AFFIRMS the judgement of the Bankruptcy Court.

SO ORDERED.

**/s/ William G. Young**

**WILLIAM G. YOUNG**
**DISTRICT JUDGE**